**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

KAREN LJUNGBERG

      Plaintiff,

      v.

SAINT VINCENT HOSPITAL,
TENET HEALTHCARE CORP., and
TEAMSTERS UNION LOCAL 170,

      Defendants.

Case No.   4:23-CV-40166-MRG

**Guzman, D.J.**

<u>**Memorandum and Order**</u>

### I.   <u>Introduction</u>

This is a labor dispute case.  Plaintiff Karen Ljungberg --
who works as a *per diem* mammography technologist at Defendant
Saint Vincent Hospital[1] -- has brought this action against
Defendant-employer (Saint Vincent Hospital); Defendant-parent
company (Tenet Healthcare Corporation, "Tenet")[2], and Defendant-

---

[1] Saint Vincent Hospital's corporate name is "VHS Acquisition
Subsidiary No. 9."  [ECF No. 20 at 1].  Throughout, it will be
referred to as "Saint Vincent Hospital."

[2] In her First Amended Complaint (the "Complaint"), Plaintiff
named a purported entity called "Tenet Healthcare
Corporation/United Surgical Partners International/Conifer
Health Solutions" as the defendant-parent company of Saint
Vincent Hospital.  [ECF No. 17 at 1].  However, subsequent
briefing reveals that Tenet alone is the intended parent-company
Defendant.

union (Teamsters Union Local 170, the "Union").

In essence, Ljungberg alleges that Saint Vincent Hospital / Tenet wrongfully misclassified her on the salary step grid contained within the operative collective bargaining agreement by undervaluing her relevant prior experience and have subsequently failed to sufficiently rectify the error such that she is owed an accruing amount of backpay equal to at least $11,0971.51.[3]  She further claims that there has been retaliation for her persistence in seeking this backpay.  Her eight causes of action that target Saint Vincent Hospital / Tenet specifically (i.e., Counts I – VIII) all essentially arise from these allegations.  [Id. at 5-9].

With respect to the Union, Ljungberg claims that it breached its duty of fair representation: (1) by failing to file a timely step placement / backpay-related grievance on her behalf; (2) by passing along a proposed offer from Saint Vincent Hospital / Tenet to pay certain back wages in exchange for a general release of claims -- which Ljungberg ultimately rejected, and (3) by attempting in bad faith to shield itself from a lawsuit like this one.

The Union has moved for summary judgment on the two counts that target it: Ljungberg's breach of the duty of fair representation claim (Count IX) as well Ljungberg's more general declaratory judgment claim (Count X) that seeks a judicial pronouncement as to the amount of backpay that she is owed.

---

[3] This was the amount allegedly owed as of the date of the Complaint. (i.e., January 6, 2024).  [ECF No. 17 at 10].

After an in-person hearing [ECF No. 44] and careful consideration of the summary judgment record, the Court hereby **GRANTS** the Union's summary judgment motion [ECF No. 26] for the reasons stated below.  The Court will resolve Saint Vincent Hospital / Tenet's motion to dismiss [ECF No. 19] by way of a separate Memorandum and Order.

## II.  Background

### a. Procedural History

Ljungberg filed her Complaint [ECF No. 17] on January 6, 2024.  The Union later moved for summary judgment [ECF No. 26].  Ljungberg filed an opposition [ECF No. 31] to which the Union filed a reply [ECF No. 34].  The Court held a hearing on the Union's motion and Saint Vincent Hospital / Tenet's above-referenced motion to dismiss [ECF No. 19] on July 8, 2024 [ECF No. 44].  At the hearing, the Court took the motions under advisement.

### b. Relevant Facts

The following facts are drawn from the Complaint [ECF No. 17], the Union's statement of undisputed material facts [ECF No. 27 at 1-6], Plaintiff's statement of "Facts Not In Dispute Which Support [] Plaintiff's Cause of Action" [ECF No. 31 at 8-9], and other supporting documents and are undisputed unless otherwise noted.  Since the Court will be disposing of Saint Vincent Hospital and Tenet's motion to dismiss by way of a separate Memorandum and Order, the facts recited here are only those necessary to address the Union's summary judgment motion.

c. **Plaintiff and the Union**

Ljungberg lives in Charlton, Massachusetts. [ECF No. 17 at 1]. She began her current term of employment with Saint Vincent Hospital in 2018. [Id. at 2]. She is employed as a Per Diem Mammography Technologist. [Id.] Prior to her current term of employment, she had worked at Saint Vincent Hospital from 2003-2012 and then again from 2013-2015. [Id.] Her starting base salary in 2018 was $35.56 per hour. [Id.] Ljungberg is a member of the Union. [Id.]

The Union represents full-time and part-time "non-nurse technicians, technologists, therapists," and other employees at Saint Vincent Hospital. [ECF No. 28 at 1]. As both prior and current versions of the collective bargaining agreements between the Union and Saint Vincent Hospital / Tenet reveal, the Union acts as the "sole and exclusive bargaining representative" for its members relative to nearly every aspect of its members' employment -- including, for example, wages, hours, sick time, and benefits. [ECF 17-1 at 1; ECF 22-1 at 2]. The primary spokesperson for the Union throughout the 2022-2023 negotiations was Mr. Elias Gillen ("Gillen"), one of the Union's business agents. [ECF No. 28 at 1].

d. **The Collective Bargaining Agreement: Negotiations and Key Provisions**

During 2022 and early 2023, the Union and Tenet engaged in negotiations regarding the construction of a new, three-year collective bargaining agreement that would govern the terms and conditions of employment for members of the Union. [Id.] These

4

negotiations were lengthy and challenging and required the services of a mediator.  [Id.]  One of the primary contested issues was the nature and content of the applicable pay scale. [Id. at 2].

Ultimately, the parties agreed upon contractual provisions that, in general, indexed an employee-member's starting hourly wage -- and applicable wage increases -- to their years of relevant work experience at Tenet or elsewhere.  [ECF No. 17-1 at 10-11].  The parties further agreed that Tenet would create a "first draft" of a wage chart that would set forth member-employees' starting hourly wages based on the information Tenet had regarding each employee's[4] years of relevant work experience. [ECF No. 27 at 2].  The bargaining parties took for granted that this first iteration of the wage chart would likely misclassify certain employees because Tenet did not necessarily have fully complete records of each employee's relevant experience.  [Id.] In fact, as detailed below, the Union began pursuing higher starting wages on behalf of several allegedly misclassified employees even before the final version of the collective bargaining agreement was signed.  [Id.]

On or about March 3, 2023, the bargaining parties executed the final version of their three-year year collective bargaining agreement (the "Collective Bargaining Agreement").  [ECF No. 17-1].  By its terms, the Collective Bargaining Agreement came into

---

[4] Throughout, the use of the term "employee" or "employees" refers to those Saint Vincent Hospital employees, like Ljungberg, that were members of the Union and covered by the Collective Bargaining Agreement as defined *infra*.

effect on March 3, 2023. [Id. at 1]. A brief discussion of
several key provisions is warranted here.

Article 11 contains the applicable "Grievance and
Arbitration" regime.  [Id. at 7-9].  This section starts by
explaining that certain "day-to-day problems" could usually be
worked out between employees and their immediate supervisor and,
as such, are not considered grievances for purposes of the
Collective Bargaining Agreement.  [Id. at 7].  Article 11
continues by defining a grievance as a "complaint by an employee
(i) that as to her/him [Saint Vincent Hospital] has applied a
provision of this Agreement in violation of its terms, and (ii)
that such application has adversely affected her/him as an
employee."  [Id.]

Article 11 then proceeds to lay out a detailed, multi-step
grievance pathway.  [Id. at 7-8].  Among other things, this
section provides that grievances may be initiated by *either* the
affected employee *or* by a Union representative on the affected
employee's behalf.  [Id. at 7 ("[t]he grievance, signed by the
aggrieved employee ***or*** authorized Union representative, shall be
submitted in writing to her/his Department Director within
fourteen (14) days of the event(s) giving rise to the
grievance.") (emphasis added)].  If the affected employee is not
satisfied with the result in "Step 1", "Step 2" provides for
written appeals to be timely submitted to the appropriate
department's senior director or vice president.  [Id. at 8].
"Step 3" provides for decisions made in "Step 2" to be appealed
to Saint Vincent Hospital's Vice President of Human Resources.

6

[Id.]  "Step 4" provides in part that, "[i]f ***the Union is not
satisfied*** with the answer to the grievance given by the
Hospital's Vice President of Human Resources or her/his designee
in Step 3, the Union ***may*** refer the grievance to arbitration by
filing its written demand for arbitration with the American
Arbitration Association (pursuant to its Voluntary Labor
Arbitration Rules)." [Id. (emphasis added)].  Thus, it's clear
that whether or not the Union wishes to pursue arbitration
relating to an individual employee's grievance not only depends
on whether it is ripe for arbitration but is also squarely
within the Union's discretion.

Article 11 also provides for the way in which the Union may
file "Group Grievances".  [Id.]  On that score, Article 11
provides in part that, "[w]here two or more employees have
identical grievances or substantially similar grievances under
this Article 11, the Union ***may*** file a single 'group grievance'
on their behalf that shall be subject to resolution in the
manner set forth [elsewhere in Article 11] . . ." [Id. (emphasis
added)].  Here too, then, Article 11 grants the Union the
discretion regarding the pursuit of grievances.

Article 13 provides starting wage and wage increase regime.
[Id. at 10-11].  It provides that, subject to the Collective
Bargaining Agreement's minimum pay rate provisions, wages and
increases shall be determined by reference to the Appendix A to
the Collective Bargaining Agreement's wage chart "Step Grid."
[Id. at 10-11; ECF No. 17-1 at 34-36]. Under this scheme,
employees would have their "Year 1" wages determined by their

"step" placement on the "Step Grid", which was based on
"completed years of experience . . ." [ECF No. 17-1 at 11].
Moreover, "[a]ny employee who may not advance because they are
at or over the top step shall receive an increase of 3% in their
hourly rate." [Id.]  Further, Year 1 increases were to be
"retroactive to the first full pay period beginning on or after
July 1, 2022." [Id.]

### e. Ljungberg's Alleged Misclassification and Her Efforts to Be Re-Classified

Ljungberg alleges that she had thirty-one years of relevant
work experience prior to the Collective Bargaining Agreement
going into effect. [ECF No. 17 at 3].  Accordingly, Ljungberg
believes that she should have been placed on Step 23 of the wage
chart. [Id.][5]  However, she was instead placed at Step 7. [Id.]
Under the Collective Bargaining Agreement, Step 7's hourly wage
was $36.79 whereas Step 23's hourly wage was $50.57. [ECF No.
17 at 3].

Once Ljungberg learned of her starting hourly wage rate,
she "immediately" notified a Union representative and a Saint
Vincent's Hospital Director about the alleged misclassification.
[Id.]  On March 23, 2023 -- twenty days after the Collective
Bargaining Agreement's effective date -- Ljungberg learned that
Saint Vincent Hospital did not have a current resume on file for

---

[5] Notably, if Ljungberg was classified at a Step 23, she would
have been at the very top of the Step chart; meaning that
Article 13's above-cited provision that, "[a]ny employee who may
not advance because they are at or over the top step shall
receive an increase of 3% in their hourly rate" would apply to
her. [ECF No. 17-1 at 11].

her, and she provided one upon request as a means of proving her
alleged years of relevant experience.  [Id.]  On July 1, 2023,
per the terms of the Collective Bargaining Agreement, Ljungberg
received an additional wage increase -- bringing her new hourly
rate to $38.39. [Id.] As she points out, however, this was
neither a step increase nor a 3% increase in her hourly rate
(which would have applied had she been classified at Step 23,
*see* n. 5]). [Id.]

Ljungberg alleges that she repeatedly asked her Union
representative and Saint Vincent Hospital to be appropriately
re-classified.  [ECF No. 17 at 4].  She further alleges that
both the Union and Saint Vincent Hospital's "routinely admitted"
that her requested higher step classification is the correct
one.  [Id.]  She asked her Union representative to file a
grievance on her behalf and, after learning that one had not
been filed, she filed one herself.[6]  After determining that
pursuing her individual grievance further would be "futile",
Ljungberg filed a complaint with the Massachusetts Attorney
General's Office and received a private right of action letter
on June 30, 2023.  [Id.]

On October 7, 2023, Ljungberg emailed Saint Vincent
Hospital's Chief Human Resources Officer and informed him that
she had retained an attorney and asked when she could expect her
raise.  [ECF No. 28-22].  In that email, Ljungberg wrote in

---

[6] It is not clear when Ljungberg filed this grievance, but in her
January 2024 Complaint, she stated that it had been "recently"
filed.  [Id. at 5].

relevant part:

> I have been waiting for my pay scale to change with
> retroactive pay since March 2023.  The original amount
> was incorrect and the Union Rep, Eli, was working on
> it.  A grievance was filed but has gotten no response.
> I now have an attorney who requested that I reach out
> to you.  I have previously tried to get answers from
> our Union Re[p] and the Director of Labor Relations.
> Even Brian has tried to get answers for me.  Based on
> our new CBA do you know when my hourly rate will
> change to $50.57 and will receive the retroactive pay
> which is now up to $11,000.00 owed to me[?]

[Id. at 2].

As discussed in more detail below, on or about October 10,
2023, the Union sent Ljungberg a proposed agreement from Tenet
that would have addressed the years of experience issue and paid
her backpay.  [ECF No. 28-24].  However, this was conditioned on
Ljungberg signing a general release of claims.  [Id.]  After the
Union passed this proposed agreement on to Ljungberg and her
lawyer [ECF No. 28-26], Ljungberg rejected this proposed
agreement. [ECF No. 28-27]. Although she continues to work at
Saint Vincent Hospital, Ljungberg's alleged step
misclassification and alleged accruing backpay issues remain
unresolved.

f. **The Union's Advocacy on Behalf of Ljungberg and Others
   Similarly Situated**

As noted, the bargaining parties knew or suspected that the
first iteration of the wage chart would likely misclassify
certain employees because of Tenet's limited information
regarding relevant work experience.  [ECF No. 27 at 2].  As soon

as the first draft of the wage chart was released -- which was sometime before the effective date of the Collective Bargaining Agreement -- several employees contacted Gillen and stated that they had been misclassified. [ECF No. 28 at 2]. Ljungberg was one of these employees. [Id.]

Even before the Collective Bargaining Agreement came into effect, Gillen began advocating for Ljungberg and other allegedly misclassified employees with Tenet. [Id.] As thoroughly detailed in his affidavit [Id. at 2-9], Gillen repeatedly attempted to get Tenet to re-classify Ljungberg and the other allegedly misclassified employees. On February 27, 2023, Gillen emailed his point-of-contact at Tenet stating, in part: "Karen L[j]ungberg: Mammo, is on the list slotted at step 7 for Mammo. According to her she has been in Mommo (sic) (in and out of St Vs) since 97. That would clearly put her at the top of the chart, and this is not counting her 6 years from 91-97 in Radiology . . . Can you review and get back to me ASAP." [ECF No. 28-2 at 2]. According to Gillen, his initial messages triggered a "long negotiation" about Ljungberg's and four other employees' classification. [ECF No. 28 at 3]. As part of this exchange, Gillen sent his point-of-contact Ljungberg's resume the same day that Tenet requested it. [Id.]. In April 2023, Gillen continued to press the issue with Tenet, including through follow-ups when he did not receive a response. [See, e.g., ECF No. 28-11 at 2-4 (Gillen's emails following up on previous messages to his Tenet point-of-contact regarding updates on, among other things, an "answer for the years of

service adjustments put to the hospital . . . We do not have an answer on the adjustments.")]

In May 2023, Tenet sent Gillen a proposed adjustment to the years of experience for Ljungberg and others. [ECF No. 28-14 at 2]. Tenet stated that, "[w]e would agree, on a non-precedent setting basis, to adjust the YOE for the employees below to the following dates . . . Karen Ljungberg[:] Adjusted [Years of Experience], 7/1/1991. Her new step will be the max Step 23, rate [$]50.57." [Id.] Notably, the proposal went on to state in part that, "[t]he effective date of the change will be retroactive to the first full pay period following ratification (3/4/2023)." As Gillen pointed out in his e-mail response to this proposal [Id. at 2], setting the retroactive date for this adjustment to March 4, 2023, was seemingly at odds with the Collective Bargaining Agreement's provision that "Year 1 increases will be retroactive to the first full pay period beginning on or after July 1, 2022." [ECF No. 17-1 at 11]. In other words, Gillen was not sure why Ljungberg and other allegedly misclassified employees were not getting the full extent of the backpay to which they were seemingly entitled. Tenet's proposal also purported to limit the employees that could seek years of experience adjustments to those that were "initially submitted by the [U]nion for consideration during contract ratification, and who provided resumes for full consideration." [ECF No. 28-14 at 2]. Otherwise stated, Tenet wanted to place a cap on the employees that could seek years of experience adjustments to certain employees, including

Ljungberg.

However, Gillen did not receive a substantive response to this inquiry. [ECF No. 28 at 5]. In turn, Gillen followed up again on June 14, 2023, to inform Tenet that it would not agree to the proposal because of the limitations placed on backpay. [Id. at 5]. Gillen further informed Tenet that allegedly misclassified employees were considering their legal options and that the Union would not accept the proposed limitation on backpay nor would it "agree that no other members could come forward after these members' cases [including Ljungberg's] were settled." [Id.] Importantly, Gillen maintains that, at least at that point in time (i.e., June 2023), "I still believed that a negotiated agreement was better for our members than a grievance because we were negotiating settlements without risk of a poor outcome in arbitration." [Id.]

Despite multiple follow-up efforts, Gillen did not receive a substantive reply from Tenet on the years of experience adjustment issue for several weeks. [Id. at 5-6]. In the last week of August 2023, Gillen and Tenet exchanged emails on the subject and Gillen said that the Union would continue to pursue re-classification for the certain, named employees – which, by all accounts, seems to have included Ljungberg -- but the Union "will not bring any other names forward on this [years of experience] issue, the window to pursue it th[r]ough our process is expired." [ECF No. 28-20 at 2]. Gillen and Tenet exchanged a couple of further emails that did not resolve the issue in September 2023.

Then, on October 7, 2023, Ljungberg copied Gillen on an the above-cited email to the Saint Vincent Hospital's Chief Human Resources Officer.  See supra, p. 9.  Gillen then forwarded that email to his Tenet point-of-contact and stated, "[t]his is what I have been telling you was happening.  She can, and at this point should, go to the [Massachusetts] AG and collect triple damages.  I would suggest this get wrapped up."  [ECF No. 28-23 at 2].

Just two days later, Tenet sent Gillen a proposed agreement that sought to resolve the years of experience issue for Ljungberg and four other employees.  [ECF No. 28 at 7].  However, Tenet included a special condition that sought to condition the entire settlement, in part, on Ljungberg signing a release of claims.  [ECF No. 28-24 at 2].  As Tenet's representative explained to Gillen, "we also included a general release for Karen [Ljungberg].  The execution of the settlement agreement is contingent on Karen signing a release." [Id.]

The next day (October 10, 2023), Gillen relayed this offer to Ljungberg and her attorney. [ECF No. 28-26 at 2]. In his email transmitting the offer, Gillen took no position on whether Ljungberg should sign the release, but said that he assumed Ljungberg would want her counsel to review the offer.  [Id.]. Gillen expressed sympathy for Ljungberg's alleged misclassification and unpaid backpay saying, "[i]t is painful that it took so long, but I am happy that we have gotten to the place where we should be, and you should get what you should have gotten from the start."  [Id.]

14

A few hours later, Ljungberg informed Gillen that she would not be accepting the proposed settlement. [ECF No. 28-27]. The next day, Gillen informed Tenet that the offer was rejected for two reasons. [ECF No. 28-28]. First, because of the Union's belief that Ljungberg "should not be singled out to sign off on anything, at best it is improper, at worst some type of discrimination or harassment." [Id. at 2]. Second, Gillen explained that another employee would not receive the backpay to which she was allegedly entitled. [Id.] Gillen averred in January 2024 that he had not any further contact with Tenet after he had sent his email rejecting Tenet's offer. [ECF No. 28 at 8]. In a supplemental affidavit filed in February 2024, Gillen stated that he had in fact received a revised offer from Tenet on November 14, 2024 (i.e., one day after Ljungberg allegedly served her first complaint in this case upon Tenet) that purported to drop the general release demand. [ECF No. 35 at 2]. In a further supplemental affidavit filed in July 2024, Gillen explained that the Union had filed a grievance on behalf of Ljungberg and four other affected employees on or about June 21, 2024. [ECF No. 43 at 2]. The current status of this filed grievance is unclear.

III. **Legal Standard -- Summary Judgment**

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is considered "genuine" when a reasonable

factfinder could resolve it in favor of the nonmoving party. Morris v. Gov't Dev. Bank, 27 F.3d 746, 748 (1st Cir. 1994). A fact is considered "material" when it may affect the outcome of the suit. Id.

At the summary judgment stage, the Court must view the record in the light most favorable to the non-moving party and must "indulge all reasonable inferences" in their favor. Martins v. Vt. Mut. Ins. Co., 662 F. Supp. 3d 55, 64 (D. Mass. 2023) (citing O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993)). The moving party "bears the burden of demonstrating the absence of a genuine issue of material fact." Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000) (citations omitted).

If a properly supported summary judgment motion is presented, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial," and may not simply "rest upon mere allegation or denials of [their] pleading," but must instead "present affirmative evidence." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 256-57 (1986). "Neither party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact." Magee v. United States, 121 F.3d 1, 3 (1st Cir. 1997).

**The Duty of Fair Representation**

a. **Legal Landscape**

16

With Count IX, Ljungberg alleges that the Union breached its duty of fair representation under Massachusetts law.[7]  Before the Court reaches the issues of whether Ljungberg's state law claim is preempted by federal law or is part of a so-called "hybrid" § 301[8] / Fair Representation Claim, it will first describe the nature and contours of the duty of fair representation (hereafter, the "DFR").

A judge-made doctrine, the DFR derives from Section 9(a) of the National Labor Relations Act, <u>BIW Deceived v. Local S6, Industrial Union of Marine & Shipbuilding Workers</u>, 132 F.3d 824, 830 (1st Cir. 1997), which provides in relevant part that:

> Representatives designated or selected for the purposes of collective bargaining by the majority of the employees . . . shall be the exclusive representatives of all the employees . . . for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . .

29 U.S.C. § 159(a).

As the U.S. Supreme Court reasoned in <u>Ford Motor Co. v. Huffman</u>, in passing the National Labor Relations Act, Congress clearly had faith in the process of free

---

[7]  Plaintiff's Count IX is captioned, "Breach of the Duty of Fair Representation, in violation of [M].G.L. c. 150A s. 4(A)(1)(a) and (4)).  [ECF No. 17 at 9]."

[8] As discussed *infra*, "§ 301" here refers to Section 301 of the Labor Management Relations Act.  29 U.S.C. § 185(a) ("Section 301").  Section 301 governs breach of contract claims that arise out of a collective bargaining agreement.  Chaney v. Greyhound Lines, Inc., 09 CV 7593 (HB), 2010 U.S. Dist. LEXIS 62684, at *2 (S.D.N.Y. June 23, 2010) (citing <u>29 U.S.C. § 185(a)</u>).

collective bargaining between "employers and their
employees when conducted by freely and fairly chosen
representatives of appropriate units of employees." <u>Ford
Motor Co. v. Huffman</u>, 345 U.S. 330, 337 (1953).  However,
although unions should of course be given appropriate
latitude in this process, it does not follow that unions
have absolute authority in this regard.  <u>See</u> <u>id.</u>  Instead,
the High Court has recognized that they are bound by the
DFR: "a statutory obligation to serve the interests of all
members without hostility or discrimination toward any, to
exercise its discretion with complete good faith and
honesty, and to avoid arbitrary conduct." <u>See, e.g.</u>, <u>Vaca
v. Sipes</u>, 386 U.S. 171, 177 (1967).

As the First Circuit has explained, the DFR applies to "all
union activity" and "requires a union to serve its members
'honestly and in good faith and without invidious discrimination
or arbitrary conduct.'" <u>Lydon v. Local 103, International
Brotherhood of Electrical Workers</u>, 770 F.3d 48, 56 (1st Cir.
2014) (citations omitted).  This means that a union's DFR
applies both during the collective bargaining process *and* any
time that the union is enforcing the resulting collective
bargaining agreement.  <u>See, e.g.</u>, <u>United Steelworkers of America
v. Rawson</u>, 495 U.S. 362, 372 (1990) (citation omitted).

A breach of the DFR only occurs when a union "treats its

members arbitrarily, discriminatorily, or in bad faith." Id. (citation omitted).  As the First Circuit has noted, "[n]egligence -- without more — is insufficient to establish a breach" of the DFR.  Alston v. International Association of Firefighters, Local 950, 998 F.3d 11, 26 (1st Cir. 2021) (citation omitted).

In this context, conduct is "arbitrary" only if, "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." Miller v. U.S. Postal Serv., 985 F.2d 9, 12 (1st Cir 1993).  A union acts in "bad faith" when it "acts with an improper intent, purpose, or motive . . . [t]o establish that the Union's exercise of judgment was in bad faith, [a plaintiff] must adduce substantial evidence of fraud, deceitful action or dishonest conduct."  Alston, 998 F.3d at 26 (citations omitted).

When a reviewing court assesses a claim that a union breached its DFR, its "evaluation of the evidence concerning the union's performance must be 'highly deferential' to the union." Id. (citation omitted).  Reviewing courts "may not substitute their own views for those of the union."  Miller, 985 F.2d at 12.  Indeed, the applicable standard of review "recognizes that unions must have ample latitude to perform their representative functions."  Emmanuel v. International Brotherhood of Teamsters,

Local Union No. 25, 426 F.3d 416, 420 (1st Cir. 2005) (citation omitted).  This means that a member of a union that asserts a breach of the DFR carries a "heavy burden."  Alston, 998 F.3d at 26.[9]

With respect to the issue of how unions must handle grievances in order to comply with the DFR, controlling precedent provides some clear guidance.  As a starting point, "[a] union is under no duty to arbitrate a grievance that it honestly and in good faith believes lacks merit." Chaparro-Febus v. International Longshoremen Association, Local 1575, 983 F.2d 325, 331 (1st Cir. 1992) (citation omitted). This is because if a union were forced to arbitrate "a case that it felt had little basis in the contract, it arguably would jeopardize its credibility with the employer for purposes of later, more supportable, disputes with management policies, instituted on behalf of all members." Berrigan v. Greyhound Lines, Inc., 782 F.2d 295, 298 (1st Cir. 1986).  Further, the "duty of fair representation mandates that a union conduct at least a 'minimal investigation' into an employee's grievance," but "only an

---

[9] As the First Circuit has explained, one of the principal reasons for this judicial deference is a recognition that the collective bargaining process necessarily places the interests of an individual union member beneath the interests of the collective.  Alston, 998 F.3d at 26 (noting that the "deference afforded to the union's decisionmaking recognizes its obligation to balance the competing interests of all union members.")

'egregious disregard for union members' rights constitutes a breach of the union's duty' to investigate." Emmanuel, 426 F.3d at 420 (citation omitted).  Moreover, controlling authority provides that "[i]t is for the union, not the courts to decide whether and in what manner a particular grievance should be pursued." Id. at 421 (citation omitted).

### b. Preemption

Before the Court can reach the merits of Ljungberg's state law DFR claim, it must first decide whether it is preempted by federal law.  As the First Circuit has explained, "[i]n the labor-law arena, preemption -- the displacement of state law by the force of federal law -- is a familiar phenomenon." BIW Deceived v. Local S6, Industrial Union of Marine & Shipbuilding Workers, 132 F.3d 824, 829 (1st Cir. 1997).  One of the ways in which preemption can occur is by operation of the DFR.  Id. at 830.

Indeed, it is because a union's DFR is grounded in federal statutes that state law is preempted "whenever a plaintiff's claim invokes rights derived from a union's duty of fair representation." See, e.g., 29 U.S.C. § 159(a); BIW Deceived, 132 F.3d at 830 (citation omitted).  If the Court finds that Ljungberg's Count IX claim is preempted by federal law, it will recharacterize this state law claim as having been asserted under the National Labor Relations Act.  See, e.g., James v.

United Furniture Workers Local 89262, No. 21-cv-03893-JCS, 2021 U.S. Dist. LEXIS 154023, at *20 (N.D. Cal. Aug. 16, 2021) ("Since preemption by the duty of fair representation is one such instance of federal law 'displac[ing] state law,' [ . . . the plaintiff's] preempted claims are properly construed as asserted under the NLRA.") (citation omitted).  Courts have routinely found preemption when state law claims are based on a "union's failure to pursue a grievance or otherwise represent its members' interests." Id. at *19 (collecting cases).

### c. Hybrid § 301 / DFR Claims

If the Court determines that Ljungberg's Count IX claim is preempted by federal law, the next question will be whether Ljungberg's claim against the Union is part of a hybrid § 301 / DFR claim.  See Plummer v. Bottling Grp., LLC, No. 21-2799-RBW, 2023 U.S. Dist. LEXIS 39215, at *13 (D.D.C. Mar. 9, 2023) ("Having concluded that the plaintiff's claims are preempted by § 301 of the LMRA, the Court will next consider whether his claims constitute hybrid § 301/fair representation claims.")

As a general rule, an individual employee is required to attempt to exhaust any grievance or arbitration remedies contained within their collective bargaining agreement before they may bring suit against their employer for breach of that agreement.  DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 163 (1983) (citation omitted).

However, an exception to this general rule exists in cases where:

> [T]he union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation. In such an instance, an employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding.

> Id. at 164 (citations omitted).

As another session of this Court has explained, such a claim is referred to "a hybrid claim and [it] comprises two causes of action: a suit against an employer for breach of the collective bargaining agreement and a suit against a union for breach of the union's duty of fair representation." McNeill v. Steward Health Care, LLC, No. 19-cv-10697-ADB, 2019 U.S. Dist. LEXIS 91122, at *9 (D. Mass. May 31, 2019) (citation omitted).

Since these claims are inextricably linked, it follows that "a plaintiff must prove **_both_** that the employer broke the collective bargaining agreement and that the union breached its duty of fair representation, in order to recover against either the employer or the union." Chaparro-Febus, 983 F.2d at 330 (emphasis in original) (citations omitted). As another session of this Court has explained, it is "[b]ecause of the symbiotic nature of the hybrid suit against an employer and union pursuant to § 301, that neither claim is viable if the other fails." Wilson v. Univ. of Mass., No. 06-40024-FDS, 2007 U.S. Dist.

LEXIS 64583, at *8 (D. Mass. Aug. 9, 2007).

## IV.    <u>Application</u>

### a. <u>Ljungberg's State Law DFR Claim is Preempted by Federal Law</u>

Here, the Court easily concludes that Ljungberg's state law DFR breach claim against the Union is preempted by federal law. Ljungberg has levied three principal complaints against the Union: (1) first, she argues that it breached the DFR when it did not file a timely grievance on her behalf relative to the years of experience / step placement issue.  [ECF No. 17 at 9]. (2) Second, she argues that, in her words, the Union "required" her to sign a "special contract in order to receive income owed to her" under the Collective Bargaining Agreement.  [<u>Id.</u>].  (3) Third, she argues that "requir[ing]" her to sign this special contract was a bad faith maneuver to avoid being the target of a lawsuit like the one presently before the court.  All three of these allegations "invoke rights derived from a union's duty of fair representation" and are therefore preempted. <u>See</u> <u>BIW Deceived</u>, 132 F.3d at 830 (citation omitted).

Ljungberg's allegations regarding the failure to file a timely grievance is the very sort of claim that courts routinely find to be preempted.  <u>See e.g.</u>, <u>James</u>, 2021 U.S. Dist. LEXIS 154023, at *18 (collecting cases and observing that, "[c]ourts have routinely held that the duty of fair representation

24

preempts generic state-law claims that are based on a union's
failure to pursue a grievance or otherwise represent its
members' interests.").  Courts routinely finding preemption in
such cases is unsurprising since, as the First Circuit has
noted, an element of the DFR includes "pursu[ing] [members']
grievances in a manner consistent with the principles of fair
representation." Chauffeurs, Teamsters & Helpers, Local No. 391
v. Terry, 494 U.S. 558, 563 (1990) (citation omitted).
Therefore, since Ljungberg's grievance-based allegation goes to
the heart of the Union's DFR obligations, it follows that
preemption is proper with respect to this facet of Count IX.

Preemption is also proper relative to Ljungberg's
allegation that the Union "required" her to sign Saint Vincent
Hospital / Tenet's offer "in order to receive income owed to her
under the [Collective Bargaining] Agreement," even though this
offer allegedly violated state law, [ECF No. 17 at 9]. If this
were true, it would very likely be a failure on the part of the
Union to honor another core element of the DFR, namely,
"serv[ing] its members 'honestly and in good faith and without
invidious discrimination or arbitrary conduct.'" Lydon, 770 F.3d
at 56 (citation omitted).  Thus, this facet of Ljungberg's Count
IX claim also squarely invokes rights that derive from the
Union's DFR obligations.  Similarly, Ljungberg's argument that
the Union acted in *bad* faith by encouraging her to sign the

general release [ECF No. 31 at 2] also invokes rights that derive from the Union's DFR obligations since it is black letter law that the DFR required the Union to among other things, conduct all union activities in *good* faith.  See, e.g., <u>Vaca v. Sipes</u>, 386 U.S. 171, 177 (1967).

Accordingly, the Court easily concludes that the entirety of Ljungberg's Count IX state law claim is preempted and it will therefore recharacterize it as a claim asserted under the NRLA. <u>See, e.g.</u>, <u>James</u>, 2021 U.S. Dist. LEXIS 154023, at *20 ("Since preemption by the duty of fair representation is one such instance of federal law 'displac[ing] state law,' [ . . . the plaintiff's] preempted claims are properly construed as asserted under the NLRA.") (citation omitted).[10]

### b. **Ljungberg's Claim Against the Union is Part of a Hybrid § 301 / DFR Claim**

The Court finds that Ljungberg's DFR claim is part and parcel of a textbook hybrid § 301 / fair representation claim. At the very least, Ljungberg's Count V breach of contract claim against Saint Vincent Hospital / Tenet is predicated, in part, on the Union's allegedly flawed representation. <u>Mason v. Cent. Mass Transit Mgmt./Worcester Reg'l Transit Auth.</u>, 394 F. Supp.

---

[10] As the Union rightly pointed out in their notice of removal [ECF No. 15], the fact that Ljungberg's state law claim is preempted by federal law means that this Court has federal question jurisdiction over, at least, Ljungberg's Count IX.  <u>See</u> 28 U.S.C. § 1331.

3d 166, 172 (D. Mass. 2019) (finding that a plaintiff's DFR claim was part of a hybrid claim where "Plaintiff's claim against the Union is predicated on the Union's allegedly improper representation. Therefore, this is not a pure breach of contract claim against an employer . . . ").

Accordingly, the net result of this is that Ljungberg's Count IX DFR breach case against the Union is clearly part of a hybrid § 301 / DFR claim.  See, e.g., McNeill, 2019 U.S. Dist. LEXIS 91122, at *9 (referring to "a hybrid claim compris[ing] two causes of action: a suit against an employer for breach of the collective bargaining agreement and a suit against a union for breach of the union's duty of fair representation." (citation omitted).

Notably, Plaintiff appears to recognize this reality and in fact, alleges in her opposition to the Union's summary judgment motion that the Union attempted to "insulate" itself from a hybrid lawsuit like this one by trying to get Plaintiff to sign Saint Vincent Hospital / Tenet's release offer.  [ECF No. 31 at 2].  In other words, Plaintiff takes the position that the Union knew that its fortunes in a hybrid lawsuit would, to some extent, rise and fall with Saint Vincent Hospital / Tenet -- and so it sought to protect itself by getting Plaintiff to sign a release against these parties.  The Court can thus easily infer that Plaintiff consciously constructed this lawsuit as a hybrid

27

§ 301 / fair representation claim.

The Court will not decide today exactly which, if any, of Ljungberg's other claims (i.e., other than Count V) against Saint Vincent Hospital / Tenet are part of this hybrid § 301 / fair representation claim, but the remaining parties are to be prepared to discuss this issue at the Status Conference that will be held on September 19, 2024.

### c. **The Union Did Not Breach its DFR and is Therefore Entitled to Summary Judgment on Count IX**

As noted above, Ljungberg argues that the Union violated the DFR in three respects: (1) first, by not filing a timely grievance on her behalf relative to the years of experience / step placement issue; (2) second, by allegedly "requir[ing]" her to sign Tenet's proposed settlement agreement that contained a general release of claims, and her (3) thirdly by allegedly pushing her to sign the proposed settlement agreement was a bad faith was of insulating itself from litigation. See, e.g., [ECF No. 28-26]; [ECF No. 31 at 2]

For the reasons stated below, the Court finds that Ljungberg has failed to identify a genuine issue of material fact as to whether the Union acted in an arbitrary, discriminatory, or bad faith manner. The Court's careful review of the record leads it to conclude that the Union acted at all relevant times within its wide range of reasonableness. In

fact, the record reveals that the Union was responsive, diligent, and thoughtful in its handling of Ljungberg's claims. Accordingly, Ljungberg has not come close to sufficiently alleging that the Union breached its DFR.  Accordingly, summary judgment must enter in favor of the Union on Count IX.

### i.  Ljungberg's Grievance-Based Claim

Ljungberg's grievance-based claim against the Union fails for several reasons.  As a threshold matter, this complaint is arguably moot since the Union *is* presently pursing a grievance on behalf of Ljungberg and her similarly situated colleagues. See e.g., [ECF No. 43 at 2].  So, to the extent that this complaint against the Union is now moot, it fails on that basis.

To the extent that Ljungberg's complaint is that a grievance was not filed sooner, that argument fails for several reasons.  First, Ljungberg's proceeds from the erroneous premise that she had the authority under the Collective Bargaining Agreement to "instruct[]" her Union as to when to file a grievance on her behalf.  See, e.g., [ECF No. 17, at 4 ("Mrs. Ljungberg has instructed her union representative numerous times to file a grievance on her behalf.")]  The Collective Bargaining Agreement makes clear that she *does not* have this authority. Instead, Article 11 provides that, with respect to group grievances (i.e., like this one, where two or more employees have identical or substantially similar grievances), the Union

is explicitly given the discretion of deciding whether or not to file such a grievance. [ECF No. 17-1 at 9]. Ljungberg alleges that she filed an individual grievance (which was her right under Article 11). [ECF No. 17 at 5]. There is no evidence that the Union did anything to undercut or stymie her pursuit of this individual grievance.

Second, there is no evidence in the summary judgment record that the Union's decision not to pursue a group grievance on Ljungberg and other employees' behalf was dishonest or in bad faith. See Chaparro-Febus, 983 F.2d at 331 (explaining that "[a] union is under no duty to arbitrate a grievance that it honestly and in good faith believes lacks merit.") In fact, Gillen has told the Court -- and the Court has no reason to doubt -- that the decision not to pursue a group grievance was a strategic one that the Union believed was in its members' best interest. See, e.g., [ECF No. 28 at 5 (Gillen averring that at least as late as June 2023, "I still believed that a negotiated agreement was better for our members than a grievance because we were negotiating settlements without risk of a poor outcome in arbitration.")] Ljungberg is therefore asking this Court to do exactly what it may not do: usurp the Union's role as bargaining representative and decide whether or not it was appropriate to pursue a group grievance on Ljungberg's and other members' behalf. See Emmanuel, 426 F.3d at 421 ("[i]t is for the union,

30

not the courts to decide whether and in what manner a particular grievance should be pursued.") (citation omitted).  The Court cannot and will not play this role.

In addition to the issue of whether or not the Union should have filed a grievance, Ljungberg's Count IX claim also implicitly accuses the Union of not sufficiently responding to the claims that she made to them.  See e.g., [ECF No. 17 at 5 ("*[a]s a result of the lack of response from the Union* [to her demands to file a grievance], Mrs. Ljungberg filed a grievance on her own behalf . . . ") (emphasis added)].  In essence, then, Ljungberg is arguing that the Union did not meet the threshold requirements necessary to comply with the DFR.  The record reveals, however, that not only did the Union meets its threshold legal requirements under the DFR, it went over and above its obligations.  As explained above, Emmanuel provides that the "duty of fair representation mandates that a union conduct at least a 'minimal investigation' into an employee's grievance," but "only an 'egregious disregard for union members' rights constitutes a breach of the union's duty' to investigate."  Emmanuel, 426 F.3d at 420 (citations omitted).

In other words, this standard can be considered the baseline requirement that a Union must meet to comply with the DFR relative to the grievances that they receive.  Here, the Union did far more than conduct a minimal investigation.  In

31

fact, the record reveals that the Union not only investigated the claims made by Ljungberg and others similarly situated, it actually agreed with the basis of the complaints and started pressing the issue with Saint Vincent Hospital / Tenet *before the Collective Bargaining Agreement even went into effect*, a relatively aggressive strategy.  As thoroughly detailed above, Gillen doggedly pursued the years of experience / step classification issue for months with Saint Vincent Hospital / Tenet.  There is no genuine dispute of material fact as to whether the Union acted in an arbitrary, discriminatory, or bad faith manner with respect to the grievance-based claim.  See, e.g., Reynolds v. Steward St. Elizabeth's Med. Ctr. of Bos., Inc., 364 F. Supp. 3d 37, 62 (D. Mass. 2019) (granting summary judgment in favor of defendant-union on a DFR claim).  In Reynolds, the Court found that:

> [T]he Union acted well within its wide range of reasonableness inasmuch as it investigated the underlying facts of Mr. Reynolds's termination, appropriately advocated on his behalf during all steps of the grievance procedure, and acted well within its broad discretion when it decided not to pursue Mr. Reynolds's grievance to arbitration.

364 F. Supp. 3d at 62.

Like the union in Reynolds, the Union here appropriately advocated for Ljungberg and acted well within its broad discretion.  See id.

ii.   **Ljungberg's "Special Contract" Claim**

Ljungberg's second contention is that the Union breached the DFR when it "required" her to sign a "special contract in order to receive income owed to her" under the Collective Bargaining Agreement.  [ECF No. 17 at 9].  It is clear that Ljungberg here is referring to Saint Vincent Hospital / Tenet's proposal -- dated October 9, 2023 -- that called for a favorable resolution on the years of experience / step placement issue in exchange for, among other things, Ljungberg to sign a general release. [ECF No. 28 at 7].

At the simplest level, this claim fails because it accuses the Union of something that it did not do.  The documentary evidence reveals that the Union took no position on whether or not Ljungberg should have signed the release.  In fact, Gillen sent the proposed settlement document to Ljungberg; copied her attorney on the email and wrote in part, "I added your indicated legal representative, as I assume you may want them to review the document." [ECF No. 28-26 at 2].  Thus, not only is there no evidence that the Union "required" Ljungberg to sign the release; there is actually evidence that the Union deferred entirely to Ljungberg on the question and was careful to include her lawyer in the decision-making.  The Court finds that the Union acted appropriately in transmitting the offer to Ljungberg and her attorney -- and acted appropriately in passing along her

33

rejection of the offer.  [ECF No. 28-28 at 2].  Thus, there is
no genuine dispute of material fact as to whether the Union
acted in an arbitrary, discriminatory, or bad faith manner with
respect to the special contract-based claim.

### iii.   Ljungberg's "Bad Faith" Claim

For many of the same reasons that Ljungberg's special-
contract based claim fails, her bad faith / litigation avoidance
claim fails, also.  In essence, Ljungberg takes the position
(principally in her opposition to the Union's summary judgment
motion), that the Union pushed her to sign the general release
because it knew that Ljungberg's release against Saint Vincent
Hospital / Tenet would "shield" the Union from litigation given
the nature of hybrid § 301 / DFR claims.  [ECF No. 31 at 1-2].
This claim is without merit.  First of all, as discussed *supra*,
there is no evidence that the Union pressured Ljungberg to sign
the special contract.  Second, Plaintiff has produced no
evidence showing that the Union had any intention of such legal
maneuvering.  Third, it arguably would have been unreasonable
for the Union to have *not* communicated the special contract
offer to Ljungberg, so the argument that merely passing it along
for her consideration was an act of bad faith is entirely
unconvincing.  Accordingly, this final prong of Ljungberg's DRF
case against the Union fails.

###### iv.  Ljungberg's Declaratory Judgment Count – Count X

To the extent that Ljungberg's declaratory judgment claim
(Count X) is directed at the Union, summary judgment must enter
in the Union's favor.  With that Count, Ljungberg seeks a
judicial pronouncement, pursuant to Mass. Gen. Laws. Ch. 231 §
1, that the Plaintiff is "currently entitled to her back pay of
$11,097.51 as of October 24, 2023 and any amounts that have
accrued since that date, plus interest."  [ECF No. 17 at 10].

First, the Union has no contractual obligation to pay
Ljungberg her salary or her backpay, so there is nothing for the
Court "to declare" relative to the Union.  See e.g., Black
Magic, LLC v. Hartford Fin. Servs. Grp., Inc., Civil Action No.
2:20-cv-1743-BHH, 2021 U.S. Dist. LEXIS 48027, at *16 (D.S.C.
Mar. 12, 2021) ("Since neither HFSG nor HFIC is a party to the
Policy, they have no obligations under it. There
being nothing 'to declare' as to either [HFSG or HFIC],
[plaintiff] has failed to state a claim for declaratory
judgment against them.")  Second, for the reasons explained
herein, since the Union has prevailed in defending itself
against the sole substantive claim against it (i.e., Count IX),
Ljungberg's declaratory judgment claim against them has been
rendered superfluous.  Gregorio v. Excelergy Corp., No. 07-
2754BLS2, 2008 Mass. Super. LEXIS 469, at *20-21 (June 17, 2008)
(explaining that, as a matter of Massachusetts law,

"***[t]he declaratory judgment count adds no substantive claim***, but merely seeks an alternative form of relief; that relief may prove superfluous once the other claims are resolved, but the count states a valid claim") (emphasis added).  Accordingly, the Union is entitled to summary judgment in its favor relative to Count X.

## V.   Conclusion

For the reasons set forth above, the Union's motion for summary judgment is **GRANTED** as to both Count IX and Count X.

**SO ORDERED.**

Dated: September 18, 2024

/s/ Margaret R. Guzman
MARGARET R. GUZMAN
United States District
Judge